Exhibit B

FILED
1/25/2022 5:01 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-21-11538

| | | |
|---|---|---|
| CRYSTAL LAGOONS U.S. CORP., | § | IN THE DISTRICT COURT OF |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| MEGATEL HOMES, LLC, ZACH IPOUR, | § | |
| AND DARRELL GROOMS, | § | |
| | § | 116TH JUDICIAL DISTRICT |
| *Respondents*. | § | |

## DECLARATION OF JAVIERA DE LA CERDA

I, Javiera De la Cerda, hereby declare that the follow facts are true and correct:

1.      My name is Javiera De la Cerda. I am more than 18 years of age and am fully competent to make this declaration.

2.      I am the Intellectual Property Director of Crystal Lagoons, and I am fully authorized to make this declaration on behalf of Crystal Lagoons U.S. Corporation in the above-referenced matter. The facts stated in this declaration are within my personal knowledge or are known to me by reason of my position with Crystal Lagoons and they are true and correct.

3.      Crystal Lagoons has developed and patented an innovative technology that allows it to build and operate multi-acre, man-made lagoons for swimming and the practice of water sports with high transparency water and excellent physicochemical and sanitary quality at low costs, referred to as a Crystal Lagoons® amenity. Crystal Lagoons' technology has been very successful, with more than 70 projects already in operation or under construction, and over a thousand more being negotiated or planned across the globe. To protect its innovative product, know-how, trade secrets, and processes, Crystal Lagoons has taken steps to protect its intellectual property for its technology and business processes, including, among many other things, its systems and methods. Crystal Lagoons also has more than 800 copyrighted conceptual designs and plans.

**DECLARATION OF JAVIERA DE LA CERDA**                                              1

4.      The Crystal Lagoons technology was developed by real-estate developer and biochemist Fernando Fischmann. It allows for building large bodies of water available for recreational purposes that use up to 100 times less chemicals and up to 50 times less electricity than conventional swimming-pool technology for their operation while achieving high transparency and excellent physicochemical and sanitary water quality.

5.      The figures included below show true and accurate images of projects built and maintained in the United States that incorporate Crystal Lagoons' technology and reflect significant aesthetic, technological, functional, economical, and environmental improvements compared to a conventional swimming pool:

**Figure 1: Epperson Project, Florida (7 acres)**



**Figure 2: Lago Mar Project, Texas (12 acres)**



**Figure 3: Lago Mar Project, Texas (12 acres)**



**Figure 4: Windsong Ranch Project, Texas (5 acres)**



6.       In July 2020, Zach Ipour of Megatel Homes ("Megatel") approached Crystal Lagoons about a real-estate project that would include the development of a lagoon using Crystal Lagoons' technology in the Dallas area. The next month, Crystal Lagoons representatives planned to meet with Mr. Ipour to discuss the possibility of working together on a project called the "Venetian." Before that meeting, Crystal Lagoons and Megatel signed a Non-Disclosure Agreement, a true and accurate copy of which is attached hereto as Exhibit A (the "NDA").

7.       Pursuant and subject to the NDA, Crystal Lagoons shared Confidential Information with Megatel in the hopes of striking a deal to develop several projects with lagoons using Crystal Lagoons' technology. What started out as discussions about a single project with Megatel grew into negotiations about as many as twenty projects, after Megatel obtained information from Crystal Lagoons regarding its technology, business models, and other proprietary information.

8.       During the negotiations, Megatel insisted upon a discount that Crystal Lagoons determined was unreasonable. Mr. Ipour threatened that if Crystal Lagoons could not meet his

terms, then he would build lagoons without Crystal Lagoons. Thereafter, Crystal Lagoons' representatives came to Texas in early 2021 to visit clients, including a planned visit with Mr. Ipour. But ultimately Mr. Ipour would not meet with and stopped responding to Crystal Lagoons after February 2021.

9.     After Crystal Lagoons and Megatel stopped communicating, Crystal Lagoons learned through public information that Megatel is moving forward with a development project featuring a lagoon using the concept of Public Access Lagoons as one of its main attractions in Forney, Texas, referred to as the "Bellagio Project."

10.     A Forney City Ordinance discussed in September 2020 spoke of "provid[ing] a high quality with a unique amenity at its centerpiece, being a Lagoon," which would "allow[] for Swimming and Water sports, and includ[e] Programmed Amenities with a Beach Atmosphere." I obtained a copy of this document from the City of Forney's website, which is attached hereto as Exhibit B.

11.     I also obtained a copy of Minutes from a City of Forney Planning and Zoning Commission Meeting on September 22, 2020, attached hereto as Exhibit C, which note that the Commission discussed "the Bellagio project, which includes a '***crystal lagoon***,'" of which "[t]here are less than 10 . . . in the USA today." The Minutes also state "[t]he lagoon will be open to everyone and will be open year-round"—much like Crystal Lagoons' PAL® concept.

12.     I am also aware of public comments that were submitted in support of the Bellagio Project that suggested a "crystal lagoon" was being marketed or planned, such as the comment on page 29 of Exhibit B, which is reproduced with highlighted below:

I wanted to write in support of the Bellagio neighborhood coming to Forney with Crystal Lagoon within the community.  I am a teacher in Forney ISD and a parent of two kids, ages 11 and 13.  I think this would be an amazing addition to Forney.  We are growing so quickly and this will be a great place for families to get together and get kids out of the house and off their screens!!!

Sincerely,

Lisa Rogers

(*See* Ex. B at 29 (emphasis added)).

13.    During a later meeting of the City of Forney Planning and Zoning Commission on December 3, 2020, Darrell Grooms made a presentation in support of the Bellagio Project on behalf of Megatel as the "Applicant." During Mr. Grooms' presentation, he showed video footage of the Epperson Project by Crystal Lagoons—the same project shown above in Figure 1. A true and correct copy of an image from Mr. Grooms' presentation is included below and it may be viewed at the following link by clicking on Item IV 1 and fast-forwarding to the 7:00 mark: http://forneytx.swagit.com/play/12032020-845.



14.    David Schnurbusch, another representative of Megatel, also referred to a "crystal lagoon" when presenting to the City of Forney Planning and Zoning Commission on March 4,

2021, as can be seen around the 8:30 mark in the video available at the following link: http://forneytx.swagit.com/play/03042021-749/7/.

15.     Crystal Lagoons has also learned that Megatel is planning to build several other projects with lagoon amenities remarkably similar to those contemplated under the NDA and which have the characteristics of a lagoon using Crystal Lagoons' technology. The other projects include, but are not limited to, the "Venetian" in McKinney, Texas—the same name Crystal Lagoons and Megatel discussed during their negotiations—as well as a development in West Dallas.

16.     Crystal Lagoons is concerned that Megatel has breached the NDA and that Megatel and/or others are misusing Crystal Lagoons' name and confidential information. To investigate potential legal claims related to these issues, Crystal Lagoons is seeking the depositions requested in the Verified Rule 202 Petition filed in the above-referenced matter.

_____
JAVIERA DE LA CERDA


**JURAT**

My name is Javiera De la Cerda, my date of birth is  04/30/1986 ,
and my business address is 1395 Brickell Avenue, Suite 800, Miami, Florida 33131. I declare under penalty of perjury that every statement in the foregoing is true and correct.

Executed in Miami Dade County, State of Florida, on the  25  day of January 2022.

_____
JAVIERA DE LA CERDA


**DECLARATION OF JAVIERA DE LA CERDA**                                        7

# Exhibit A

*Crystal Lagoons*

WORLD'S TOP AMENITY

## NON-DISCLOSURE AGREEMENT

**BETWEEN:**

1.    **Crystal Lagoons U.S. Corp.,** a company duly organized and existing under the laws of the State of Delaware having its principal place of business at 2 Alhambra Plaza, Penthouse 1B, Coral Gables, Florida 33134 ("**Crystal Lagoons**"); and

2.    **Megatel Homes, LLC**, a company duly organized and existing under the laws of Texas,having its principal place of business at 2101 Cedar Springs Rd, Ste. 700, Dallas, Texas 75201 ("**Company**"); collectively referred to as "**Parties**" and individually as "**Party**".

**WHEREAS:**

i.    Crystal Lagoons is part of the Crystal Lagoons group, which has developed and owns several technologies which include know-how, systems, techniques and methods of construction, hydraulic systems and techniques, designs, plans, drawings, tools, materials such as liner, equipment, systems and methods of telemetry control, software, water treatment methods, additives and chemicals, mechanisms and vacuum systems, including a bottom-cleaning cart, boats, trademarks, business model, look-and-feel, domain names and distinctive marks, logos, and other elements and related infrastructure, which have been protected by privileges of Industrial Property, Intellectual Property and/or trade secrets, which allow one to design, build, operate and maintain artificial crystal clear water lagoons and floating crystal clear water lagoons, public access lagoons, and to maintain and treat bodies of water for recreational and industrial purposes, including industrial cooling applications, industrial water treatment, treatment of water for desalination, infiltration, for use in mining applications in heating, air conditioning and refrigeration, among other recreational or industrial purposes (the "**Technology**").

ii.    Moreover, Crystal Lagoons group has developed the "**Public Access Lagoon**" or "**PAL**" which is an innovative concept, that expands the tropical turquoise lagoons beyond the private-accessed residential market to new locations such as public parks, retail centers, golf courses, racetracks, and more, by offering a ticketed entry to the public under a unique concept surrounded by a specific look and feel/trade dress. PALs are the anchor for diverse amenities such as restaurants, beach clubs, water sports, retail stores, amphitheaters, recreational and cultural activities, concerts, outdoor cinemas and much more. PALs are part of Crystal Lagoons' Technology.

iii.    The Company develops and builds single family and multi-family homes.

iv.    In the course of dealings, the Parties may disclose Confidential Information to each other.

v.    Confidential Information disclosed between the Parties (or their subsidiaries and affiliates) will not jeopardize or relinquish their proprietary rights.

**IT IS HEREBY AGREED** as follows:

1.    In this Agreement:
"**Confidential Information**" means all information (whether marked as Confidential or not) in any media including, but not limited to, all rendering, sketches, drawings, economic proposals, business model, data, know-how, formulae, processes, designs, documents, software, programs, photographs and other material related to the dealings between the parties, the business affairs or products of the Disclosing Party, its customers, clients and business associates disclosed by the Disclosing Party from time to time. Any information created by Recipient using any part of the Confidential Information shall also be Confidential Information. Any and all information relating to the Technology is also Confidential Information.
"**Disclosing Party**" means the Party disclosing the Confidential Information (or its subsidiaries and affiliates).
"**Recipient**" means the Party receiving the Confidential Information (or its subsidiaries and affiliates).
"**Purpose**" means to evaluate the potential execution of an agreement between the Parties.

2.    In consideration of the disclosure of Confidential Information, Recipient shall (whether acting by its officers, agents, employees or otherwise):
2.1    not publish or disclose Confidential Information (or any part) to any third party without prior written consent of the Disclosing Party;
2.2    not disclose Confidential Information (or any part) to any of its employees other than those who must know for Recipient to carry out its business with the Disclosing Party;
2.3    keep secure and confidential the Confidential Information and not copy any part (or convert into an alternative format) without prior written consent of the Disclosing Party; and
2.4    only use Confidential Information in accordance with the Purpose.

3.    The following shall not constitute "Confidential Information":
3.1    Information which is, at the time of disclosure or which subsequently becomes, freely available in the public domain not as a result of breach of this Agreement;
3.2    Information which the Recipient can show that it is known to it prior to the time of disclosure;

3.3  Information which is disclosed to Recipient in good faith by a third party not bound by duty of confidentiality; or

3.4  Information which the Recipient is required to disclose by:
    (i)   law or statutory body; or
    (ii)  order by any court.

4.  If Recipient becomes legally compelled to disclose Confidential Information pursuant to clause 3.4, it shall, as permitted by applicable law, provide the Disclosing Party five (5) days' notice prior to disclosure, so Disclosing Party may take appropriate measures.

5.  These obligations shall remain in full force and effect until information ceases to qualify as Confidential Information in accordance with Clause 3.

6.  Upon the written request of the Disclosing Party, the Recipient agrees to the extent practicable to return to the Disclosing Party all documents (whether paper or electronic) containing Confidential Information provided to the Recipient by or on behalf of the Disclosing Party, or destroy all copies of any analyses, memoranda or other documents (whether paper or electronic) derived from the Confidential Information provided to the Recipient by or on behalf of the Disclosing Party, as well as expunge all Confidential Information provided to the Recipient by or on behalf of the Disclosing Party from any computer, word processor or other device containing such information.

7.  This Agreement neither grants a license nor transfers any patents, copyright, trademark, ideas, brand or other intellectual or industrial property right held by Crystal Lagoons or Crystal Lagoons' business group. The Technology, as well as any update, discovery and/or improvement, and any and all developments, ideas, concepts, inventions, patents, copyrights and any other type of intellectual/industrial property derived from the Technology or Confidential Information of Crystal Lagoons or from the use and/or exploitation of the Technology or the Confidential Information of Crystal Lagoons or of any of the components of the Technology or Confidential Information of Crystal Lagoons, are the property of and shall inure to the sole benefit of the Crystal Lagoons business group. The Company shall have no right to use the Confidential Information of Crystal Lagoons except as expressly provided herein.

8.  Neither Party shall use the other's name or trademark, unless authorized in writing. Recipient may not imply or represent that it has any mandate or representation powers from the Disclosing Party.

9.  This Agreement will be binding on the parties, their affiliates, successors, and assigns.

10.  Neither the Company nor any of its directors, officers, representatives, agents or affiliates have violated, or will violate, any anti-corruption laws (including anti-corruption and anti-bribery laws promulgated by the government authorities of the Markets, the European Union and the United States, and any related rules, regulations and administrative orders). The Company shall immediately notify Crystal Lagoons in the event it becomes aware of any investigation in connection with the actual or potential violation of such anti-corruption laws by any of its directors, officers, representatives, agents or affiliates.

11.  The construction, validity and performance of this Agreement shall be governed by the laws of the State of New York, except with regard to its conflict of law principles.

12.  The Parties represent and warrant that the undersigned have the authority to act on behalf of the Parties and to bind them and all who may claim through it to the terms and conditions of this Agreement. The undersigned represent and warrant that they have the capacity to act on their own behalf and on behalf of all who might claim through them to bind them to the terms and conditions of this Agreement

Signed for and on behalf of:

**Crystal Lagoons U.S. Corp**

*Eric Cherasia*
_____
Name:  Eric Cherasia
Title:  Vice President
Date:  8/6/2020

[Company name] *Megatel Homes, LLC*

_____
Name:
Title:
Date:  8/5/20  *President.*

2

# Exhibit B

**CITY OF FORNEY, TEXAS**

**ORDINANCE NO. _____**

**AN ORDINANCE OF THE CITY OF FORNEY, TEXAS, AMENDING THE COMPREHENSIVE ZONING ORDINANCE NO. 1085, AND MAP, AS AMENDED, BY CHANGING THE ZONING ON APPROXIMATELY 349.09 ACRES OF LAND IN THE A. HYER SURVEY, ABSTRACT NO. 203, IN THE CITY OF FORNEY, KAUFMAN COUNTY, TEXAS, FROM AG –AGRICULTURAL DISTRICT TO PD – PLANNED DEVELOPMENT OVERLAY DISTRICT, WITH BASE ZONING DISTRICTS DESIGNATED AS SF-6 – SINGLE-FAMILY RESIDENTIAL-6 DISTRICT, MU – MIXED USE DISTRICT, AND MF-15 – MULTI-FAMILY RESIDENTIAL-15 DISTRICT; PROVIDING A SEVERABILITY CLAUSE; PROVIDING A SAVINGS CLAUSE; PROVIDING A REPEALER CLAUSE; PROVIDING A PENALTY CLAUSE; AND PROVIDING FOR PUBLICATION AND AN EFFECTIVE DATE.**

**WHEREAS,** the City Council of the City of Forney ("City Council"), pursuant to Chapter 211 of the Texas Local Government Code, as amended, possesses the power to regulate zoning and development in the City; and

**WHEREAS**, all legal requirements, conditions, and prerequisites have been complied with prior to this case coming before the City Council of the City of Forney; and

**WHEREAS**, the City Council of the City of Forney, after public notice and public hearing as required by law, and upon due deliberation and consideration of the recommendation of said Planning and Zoning Commission of the City of Forney and of all testimony and information submitted during said public hearing, has determined that, in the public's best interest and in support of the health, safety, morals, and general welfare of the citizens of the City, the zoning of the property described herein shall be changed, and that the official zoning map of the City of Forney, Texas, shall be amended to reflect the rezoning of the property described.

**NOW THEREFORE**, **BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF FORNEY, TEXAS THAT:**

<u>Section 1</u>.    **FINDINGS INCORPORATED**

All of the above premises are found to be true and correct legislative and factual determinations of the City of Forney and are hereby approved and incorporated into the body of this Ordinance as if copied in their entirety.

<u>Section 2</u>.    **ZONING AMENDED**

From and after the effective date of this Ordinance, the property described herein shall be rezoned as set forth in this section, and the official zoning map of the City of Forney, Texas, is hereby amended and changed in the following particulars to reflect the action taken herein, and all other existing sections, subsections, paragraphs, sentences, definitions, phrases, and words of said City of Forney, Texas Comprehensive Zoning Ordinance, Ordinance No. 1085, as amended ("Zoning Ordinance"), are not amended, but shall remain intact and are hereby ratified,

verified, and affirmed, in order to create a change in the zoning classification of the property described herein, as follows:

That zoning for certain tracts of land being 349.09 acres of land in the A. Hyer Survey, Abstract No. 203, and more fully described in Exhibit "A" attached hereto and incorporated herein for all purposes (the "Property"), presently zoned AG – Agricultural District, is hereby rezoned PD – Planned Development Overlay District, with  base zoning districts of SF-6 – Single-Family Residential-6 District, MU – Mixed Use District, and MF-15 – Multi-Family Residential-15 District. The Planned Development is zoned in accordance with Exhibit "B" (Planned Development Conditions), Exhibit "C" (Concept Plan), Exhibit "D" (Lagoon Concept Plan), Exhibit E (Multi-Family Concept Elevation Plan) and Exhibit F (Landscape and Screening Plan), attached hereto and incorporated herein by reference as if repeated verbatim.

### Section 3.    SEVERABILITY CLAUSE

It is hereby declared to be the intention of the City Council that the words, phrases, clauses, sentences, paragraphs and sections of this Ordinance are severable, and if any word, phrase, clause, sentence, paragraph or section of this Ordinance shall be declared unconstitutional by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality shall not affect any of the remaining words, phrases, clauses, sentences, paragraphs and sections of this Zoning Ordinance, since the same would have been enacted by the City Council without the incorporation of any such unconstitutional word, phrase, clause, sentence, paragraph or section.

### Section 4.    SAVINGS CLAUSE

The Zoning Ordinance shall be and remain in full force and effect save and except as amended by this Ordinance.

### Section 5.    REPEALER CLAUSE

Any provision of any prior ordinance of the City, whether codified or uncodified, which is in conflict with any provision of this Ordinance, is hereby repealed to the extent of the conflict, but all other provisions of the ordinances of the City, whether codified or uncodified, which are not in conflict with the provisions of this Ordinance shall remain in full force and effect.

### Section 6.    PENALTY CLAUSE

Any person, firm, or corporation violating any of the provisions or terms of this Ordinance shall be guilty of a misdemeanor and upon conviction, shall be fined a sum not to exceed $2,000.00 for each offense, and each and every violation or day such violation shall continue or exist, shall be deemed a separate offense.

### Section 7.    EFFECTIVE DATE

This Ordinance shall take effect immediately from and after its passage and the publication of the caption, as the law and Charter in such cases provide.

**PASSED, APPROVED AND ADOPTED** by the City Council of the City of Forney, Texas, on this the _____ day of _____, 2021.


_____
**MARY PENN, Mayor**
**City of Forney**

**ATTEST:**


_____
**DOROTHY BROOKS, TRMC, CMC, City Secretary**


**APPROVED AS TO FORM:**


_____
**JON THATCHER, City Attorney**

EXHIBIT A
**BELLAGIO**

Field Notes

**BEING** that certain 246.38 tract, or a parcel of land situated in the A. Hyer Survey, Abstract No. 203, Kaufman County, Texas, and being all that called 241.473 acre tract as conveyed from Glenn Red Whaley to Whaley Investments, Ltd., as recorded in Volume 4326, Page 196, Real Records, Kaufman County, Texas, and being a part of that called 210.739 acres tract as conveyed from Glenn Red Whaley to Whaley Investments, Ltd., as recorded in Volume 4326, Page 196, of the Real Records of Kaufman County, Texas and being more particularly described by metes and bounds as follows:

**BEGINNING** at a 1/2 inch iron rod found at the north corner of said 241.473 acres tract, said point of being in the Southwest R.O.W. of Farm Market Road No. 741:

**THENCE,** South 45 Degrees 45 Minutes 41 Seconds East, along the Southwest R.O.W. of Farm Market Road No. 741 a distance of 2474.81 feet to concrete monument found at a beginning of a curve to the right, with a radius 909.93 feet, a delta angle of 89 Degrees 04 Minutes 00 Seconds, a chord bearing of South 01 Degrees 13 Minutes 41 Seconds East, for a chord distance of 1276.31 feet;

**THENCE,** continuing along the Southwest Right Of Way line of said Farm Market Road No. 741, and along said curve, to the right an arc length of 1414.49 feet to a Point for corner;

**THENCE,** South 43 Degrees 21 Minutes 28 Seconds West, along the Northeast R.O.W. of Farm Market Road No. 741, a distance 1215.68 feet to a concrete monument found at a beginning of a curve to the left, with a radius 999.93 feet, a delta angle of 09 Degrees 56 Minutes 00 Seconds, a chord bearing of South 38 Degrees 23 Minutes 28 Seconds West, for a chord distance of 173.14 feet;

**THENCE,** continuing along the Northeast Right Of Way line of said Farm Market Road No. 741, and along said curve to the left, an arc length of 173.36 to a point for corner, being a Northeasterly corner of LAKEWOOD TRAILS ADDITION, PHASE ONE, an Addition to the City of Forney, ETJ by the map or plat thereof recorded in Plat Cabinet 3, slide 522, Plat Records, Kaufman County, Texas;

**THENCE,** South 43 Degrees 06 Minutes 10 Seconds West, along a Southerly line of LAKEWOOD TRAILS ADDITION, PHASE ONE said a distance of 549.46 feet to ½ inch iron rod found, for an ell corner of said LAKEWOOD TRAILS ADDITION, PHASE ONE, and the south corner of this tract;

**THENCE,** North 45 Degrees 52 Minutes 08 Seconds West, along a Northeasterly line of said LAKEWOOD TRAILS ADDITION, PHASE ONE, a distance of 3408.95 feet to a point for corner, being the North corner of said LAKEWOOD TRAILS ADDITION, PHASE ONE;

**THENCE,** South 44 Degrees 15 Minutes 00 Seconds West, along a Northwesterly line of said LAKEWOOD TRAILS ADDITION, PHASE ONE, a distance of 199.67 feet to a point for corner;

**THENCE,** North 44 Degrees 42 Minutes 02 Seconds West, a distance of 29.18 feet to 1/2 inch pipe found for corner;

**THENCE**, North 45 Degrees 34 Minutes 58 Seconds West, a distance of 1405.27 feet to a point for corner;

**THENCE**, North 43 Degrees 47 Minutes 09 Seconds West, a distance of 907.80 feet to a point for corner;

**THENCE**, South 45 Degrees 44 Minutes 30 Seconds East, a distance of 1435.46 feet to 1/2 inch rod found at the Southwest corner of Lot 1 Block A, of the Forney High School Addition, an addition to the City of Forney by map or plat thereof recorded in Plat Cabinet 2 Slide 410 Plat Records, Kaufman County, Texas;

**THENCE**, North 43 Degrees 47 Minutes 18 Seconds West, a distance of 2126.17 feet to the POINT OF BEGINNING and containing 246.38 acres or 10,732,333 square feet of land, more or less.

**NOTE:** EXHIBIT WAS NOT CREATED FROM AN ON THE GROUND SURVEY AND SHALL NOT BE USED FOR FILING OR RECORDING PURPOSES.

EXHIBIT A – 1
**BELLAGIO EAST**

Field Notes

**BEING**  that certain 102.71 acres tract, or parcel of land situated in the A. Hyer Survey, Abstract No. 203, Kaufman County, Texas, and being all of a 48.693 acre tract of land, called Tract 9, Parcel B, conveyed from Glenn "Red" Whaley to Whitney Heritage III, L.L.C, by Special Warranty Deed with Vendor's Lien, as recorded in Volume 2511, Page 622, Official Public Records, Kaufman County, Texas, and being all of a 54.373 acre tract of land, conveyed to Glenn Red Whaley, by Warranty Deed, as recorded in Instrument Number 2013-0006533, Official Public Records, Kaufman County, Texas and being more particularly described by metes and bounds as follows:

**BEGINNING** at a 3/8 inch iron rod found at the South corner of said 48.693 acre Tract 9, Parcel B, and along the Northwesterly line of a called Tract 2, conveyed to Marcus Bryant Yates et ux, by deed recorded in Volume 1003 Page 189, Real Property Records, Kaufman County, Texas;

**THENCE**, North 45 Degrees 11 Minutes 20 Seconds West, along the Southwesterly line of said 48.693 acre Tract 9, Parcel B, and along the Easterly line of Farm Market Road No. 741(90' R.O.W.), a distance of 267.83 feet to a 1/2 inch iron rod found;

**THENCE**, North 40 Degrees 24 Minutes 15 Seconds West, continuing along the Southwesterly line of said 48.693 acre Tract 9, Parcel B, and along the Easterly Right Of Way line of said Farm Market Road No. 741, a distance of 174.63 feet to a concrete monument found;

**THENCE**, North 45 Degrees 11 Minutes 46 Seconds West, continuing along the Southwesterly line of said 48.693 acre Tract 9, Parcel B, and along the Easterly Right Of Way line of said Farm Market Road No. 741, to a concrete monument found at a distance of 762.64 feet;

**THENCE**, North 45 Degrees 22 Minutes 53 Seconds West, passing the calculated west corner of said 48.693 acres tract and south corner of said 54.373 acre tract at 207.44 feet and continuing along the Southwesterly line of the said 54.373 acre tract, and along the Easterly line of said Farm Market Road No. 741, a distance of 694.16 feet to a concrete monument found at the beginning of a curve to the right, with a radius 909.86 feet, a delta angle of 88 Degrees 43 Minutes 56 Seconds, a chord bearing of North 01 Degrees 00 Minutes 55 Seconds West, for a chord distance of 1272.42 feet;

**THENCE**, continuing along the Southwesterly line of the said 54.373 acre tract, along the Easterly Right Of Way line of said Farm Market Road No. 741, along said curve, to the right an arc length of 1409.07 feet to concrete monument found;

**THENCE**, North 43 Degrees 21 Minutes 02 Seconds East, along the Easterly line of said Farm Market Road No. 741, a distance of 63.95 feet to a point for corner at the West corner of a 0.227 acres tract, conveyed to Jacob Derieux, by deed recorded in Instrument Number 2018-0003749 Official Public Records, Kaufman County, Texas, and a Northwesterly corner of said 54.373 acres tract, which a 1/2 inch iron rod found bears North 45 Degrees 12 Minutes 05 Seconds East, a distance of 0.31 feet

THENCE, South 45 Degrees 12 Minutes 05 Seconds East, along the Southwesterly line said 0.227 acre tract, and a Northerly line of said 54.373 acre tract, passing a 1/2 iron rod found at a distance of 396.39 feet, at the South corner of said 0.227 acre tract, and the West corner of a 4.654 acre tract, conveyed to Jacob Derieux, by deed recorded in Instrument Number 2018-0003749, Official Public Records, Kaufman County, Texas, continuing a total distance of 799.79 feet to a 1/2 inch iron rod found, at the South corner of said 4.654 acres tract, and an ell corner of said 54.373 acre tract;

THENCE, North 43 Degrees 42 Minutes 01 Seconds East, along the Southeasterly line of 4.654 acre tract, and a Northwesterly line of said 54.373 acre tract, a distance of 269.15 feet to a point for corner;

 THENCE, North 43 Degrees 10 Minutes 51 Seconds East, continuing with said common line of 4.654 acre tract, and 54.373 acre tract, a distance of 231.83 feet to a 1/2 inch iron rod found, at the East corner of said 4.654 acre tract, and an ell corner of said 54.373 acre tract, which a 1/2 inch iron rod found, bears South 41 Degrees 11 Minutes 55 Seconds East a distance of 2.11 feet;

THENCE, North 45 Degrees 18 Minutes 06 Seconds West, along the Northeasterly line of said 4.654 acre tract, and a Northeasterly line of said 54.373 acre tract, a distance of 372.84 feet to a 1/2 inch iron rod found, at the South corner of a 4.879 acres tract, conveyed to Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, a Utah Corporation Sole, by deed recorded in Instrument Number 2003-04504, Official Public Records, Kaufman County, Texas, which a 1/2 inch iron rod found, bears , North 45 Degrees 18 Minutes 06 Seconds West a distance of 32.76 feet;

THENCE, North 43 Degrees 03 Minutes 39 Seconds East, along the Southeasterly line of said 4.879 acres tract, and a Northerly line of said 54.373 acre tract, a distance of 500.39 feet to a 1/2 inch iron rod found, in the Southwesterly line of Golden Meadow Estates, by plat recorded in Cabinet 1 Slide 748, Plat Records, Kaufman County, Texas, said corner being the East Corner of said 4.879 acre tract, and the North corner of said 54.373 acre tract;

THENCE, South 45 Degrees 11 Minutes 41 Seconds East, along the West line of said Golden Meadow Estates, passing 1/2 inch rods found at 272.64 feet, at 422.82 feet, at 722.69 feet, at 872.52 feet, and passing at a distance of 1858.96 feet a 1/2 inch iron rod found, at the South corner of the said Golden Meadow Estates, and the West corner of a 5.000 acre tract, conveyed to Nicholas Brincks et ux, by deed recorded in Instrument Number 2015-0019751, Official Public Records, Kaufman County, Texas, and continuing a total distance of 1921.76 feet to 1/2 inch rod found, for an ell corner of said 5.00 acre tract, and east corner of said 54.373 acre tract.

THENCE, South 43 Degrees 54 Minutes 18 Seconds West, along a Northerly line of said 5.000 acre tract, and a Southerly line of said 54.373 acre tract, a distance of 458.68 feet, to a 3/8 inch iron rod found for a Southwesterly corner of said 5.00 acre tract, and a Southeast corner of said 54.373 acre tract, said corner being in the Northeasterly line of said 48.693 acre tract;

THENCE, South 45 Degrees 31 Minutes 44 Seconds East, along a Southerly line of said 5.000 acre tract, and along a Southerly line of a 5.000 acre tract, conveyed to Sharon K. Everett, by deed recorded in Instrument Number 2018-00120181, Official Public Records, Kaufman County, Texas, and along the Southerly line of a 7.002 acre tract, conveyed to Keith Jones et ux, by deed recorded in Instrument Number 2008-00023050, Official Public Records, Kauffman County, Texas, continuing a total distance of 467.36 feet, to a 3/8 inch iron rod found, for East corner of said 48.693 acre tract, and the South corner

of said 7.00 acre tract, and the North corner of Tract 1 as conveyed to said Marcos Bryant et ux, in Volume 1003 page 189, Real Records, Kaufman County, Texas ;

**THENCE**, South 44 Degrees 10 Minutes 38 Seconds West, along the Northwesterly line of said Tract 1 and Tract 2, conveyed to Marcus Bryant Yates, a distance of 1507.61 feet, to the POINT OF BEGINNING and CONTAINING 4,474,059 square feet or 102.71 acres of land more or less.

**NOTE:** EXHIBIT WAS NOT CREATED FROM AN ON THE GROUND SURVEY AND SHALL NOT BE USED FOR FILING OR RECORDING PURPOSES.

# EXHIBIT "B"
## PLANNED DEVELOPMENT CONDITIONS

**DESCRIPTION**

This Planned Development is contained within two separate tracts of land being a 246.38 Acres tract and a 102.71 Acres tract.  The 246.38-acre tract is bounded by the Forney High School addition, FM 741 and the Lakewood Phase 1 Subdivision.  The102.71-acre tract is bounded by FM 741 & adjacent to the Golden Meadows Subdivision.  The total acreage of the overall Planned Development is 349.09 Acres.  The boundaries of this Planned Development Zoning District are defined in the legal descriptions attached herein as Exhibit "A", "A-1" & "A-2".

**PURPOSE AND INTENT**

The purpose of this Planned Development Zoning District is to provide a mixed use development and allow flexibility to the established minimum requirements in the underlying zoning districts described below.  The intent is to provide a high quality development with a unique amenity as its centerpiece, being a Lagoon. The development will provide a Restaurant, Retail Components, Multi-purpose Clubhouse including a Fitness Center/ Spa and related uses along with multiple housing products, all interconnected through trails, open spaces, and golf cart paths.

**GENERAL CONDITIONS**

This Planned Development shall conform to any and all applicable articles and sections of the City of Forney Zoning Ordinance (#1085) and City of Forney Subdivision Ordinance (#1012), except as amended herein.  The Base Zoning District for each area of the site is indicated in the table below.  Development of these tracts shall conform to the stated special development, zoning and lot standards and conditions established herein within this Planned Development Ordinance.

| AREA | BASE ZONING DISTRICT |
|------|----------------------|
| A | SF-6 – Single-Family Residential |
| B | SF-6 – Single-Family Residential |
| C | SF-6 – Single-Family Residential |
| D | Mixed Use/MF-15 Multi-Family Residential |
| E | MF-15 Multi-Family Residential |

**DEVELOPMENT CONDITIONS**

**AREA A – Base Zoning SF-6 Single-Family Residential with the following amendments:**
**Refer to Exhibits "C" & "C-1"**

AREA REGULATIONS

| | |
|---|---|
| Minimum Lot Area | Five Thousand (5,000SF) Square Feet |
| Minimum Lot Width Typical | Forty (40') Feet Measured at Front Building Setback |
| Minimum Lot Width at ROW | Thirty-five (35') Feet Measured at ROW on Cul-de-Sacs, Knuckles, Eye-brows & Curves |
| Lot Depth Typical | One Hundred and Twenty-Five (125') Feet |
| Minimum Lot Depth Absolute | One Hundred and Fifteen (115') Feet |
| Minimum Front Yard | Twenty (20') Feet |
| Minimum Garage Door Face Setback | Twenty-Five (25') Feet |

| | |
|---|---|
| Minimum Side Yard | Five (5') Feet for interior side yards, Ten (10') Feet on Corner Lots Street Side Only |
| Maximum Lot Coverage | Fifty Percent (50%) for Main House Slab |
| Minimum Floor Area per Dwelling Unit | A minimum of Eighteen-hundred (1,800 SF) Square Feet Air Conditioned Floor Area with the agreement that for every two dwelling units built at Two-thousand (2,000 SF) Square Feet Air Conditioned Floor Area or larger, we are allowed to build one dwelling unit at Sixteen-hundred (1,600 SF) Square Foot Air Conditioned Floor Area. |

**AREA B – Base Zoning SF-6 Single-Family Residential with the following amendments: Refer to Exhibits "C" & "C-1"**

<u>AREA REGULATIONS</u>

| | |
|---|---|
| Minimum Lot Area | Six Thousand Two Hundred Fifty (6,250SF) Square Feet |
| Minimum Lot Width Typical | Fifty (50') Feet Measured at Front Building Setback |
| Minimum Lot Width at ROW | Thirty-Five (35') Feet Measured at ROW on Cul-de-Sacs, Knuckles, Eye-brows & Curves |
| Minimum Lot Depth Typical | One Hundred Twenty-Five (125') Feet |
| Minimum Lot Depth Absolute | One Hundred and Fifteen (115') Feet |
| Minimum Front Yard | Twenty (20') Feet |
| Minimum Garage Door Face Setback | Twenty-Five (25') Feet |
| Minimum Side Yard | Five (5') Feet for interior side yards, Ten (10') Feet on Corner Lots Street Side Only |
| Maximum Lot Coverage | Fifty Percent (50%) for Main House Slab |
| Minimum Floor Area per Dwelling Unit | A minimum of Eighteen-hundred (1,800 SF) Square Feet Air Conditioned Floor Area with the agreement that for every two dwelling units built at Two-thousand (2,000 SF) Square Feet Air Conditioned Floor Area or larger, we are allowed to build one dwelling unit at Sixteen-hundred (1,600 SF) Square Foot Air Conditioned Floor Area. |

**AREA C – Base Zoning SF-6 Single-Family Residential with the following amendments: Refer to Exhibits "C" & "C-1"**

<u>AREA REGULATIONS</u>

| | |
|---|---|
| Minimum Lot Area | Seven Thousand Seven Hundred Fifty (7,750 SF) Square Feet |
| Minimum Lot Width Typical | Sixty-Two (62') Feet Measured at Front Building Setback |
| Minimum Lot Width at ROW | Thirty-Five (35') Feet Measured at ROW on Cul-de-Sacs, Knuckles, Eye-brows & Curves |
| Minimum Lot Depth Typical | One Hundred Twenty-Five (125') Feet |
| Minimum Lot Depth Absolute | One Hundred and Fifteen (115') Feet |
| Minimum Front Yard | Twenty (20') Feet |
| Minimum Garage Door Face Setback | Twenty-Five (25') Feet |
| Minimum Side Yard | Six (6') Feet for interior side yards, Ten (10') Feet on Corner Lots Street Side Only |
| Maximum Lot Coverage | Fifty Percent (50%) for Main House Slab |
| Minimum Floor Area per Dwelling Unit | A minimum of Eighteen-hundred (1,800 SF) Square Feet Air Conditioned Floor Area with the agreement that for every two dwelling units built at Two-thousand (2,000 SF) Square Feet Air Conditioned Floor Area or larger, we are allowed to build one |

dwelling unit at Sixteen-hundred (1,600 SF) Square Foot Air Conditioned Floor Area.

SPECIAL REQUIREMENTS (A, B, and C)

| | |
|---|---|
| Usable Open Space Requirements | See Below as defined for the entire planned development |
| Alleys | Each dwelling unit shall be front entry |
| Gated/secured entrances | Gated/secured entrances shall not be required |
| Sidewalks | No sidewalks shall be required, on side of streets, where streets are adjacent to proposed trails/golf cart paths. Sidewalks, where necessary, will be five (5') wide |
| Trails/Golf Cart Paths | Shall be allowed as necessary |
| Golf Cart Parking | Allowed within Areas A, B & C within driveway limits. |
| Lot Landscape | Area A Lots shall have one 3" caliper canopy tree, from City approved list, located within the front yard. Area B Lots shall have one (3") Inch caliper canopy tree and one (3") Inch ornamental tree, from City approved list, located within the front yard.  Area C Lots shall have two (3") Inch caliper canopy trees, from City approved list, with one in the front yard and the second in the front, rear or side yard. |

**AREA D – Mixed Use/MF-15 Multi-Family – Base Zoning MF-15 Multi-Family & Mixed Use (MU) for any site plans containing retail, restaurant, personal service, or lagoon with the following amendments to the City's Zoning Ordinance:**
**Refer to Exhibits "C", "D" & "E"**

| | |
|---|---|
| Permitted Uses (MU) | To include man-made Lagoon (fee based) with some of the related accessories as depicted on Exhibit D, Multi-Family, Swimming Pool (private, membership, public), Offices (sales, rental, management, maintenance), Hair Salon, Nail Salon, Spa/Massage, Service Kiosk, Sales Kiosk, Porter/Valet, Health Club/Fitness Center/Gym, Restaurant (indoor with outdoor patio seating), Swim-up Bar tied to Restaurant use, Coffee Shop/Café (indoor, outdoor, and kiosk), Retail, Temporary Parking Lot (gravel or asphalt), Golf Cart Parking, Amusement (outdoor), Farmer's Market, Park and/or Playground (private and public), Multi-Purpose Club House/Amenity Center, Food Trucks, Operations Office, Screened Storage, and Screened Equipment for Lagoon. A group of fully furnished Multi-Family units, on designated floors, not to exceed Fifty (50) units may be located within a Multi-Family building to be used as visitor vacation destination rentals specifically for Lagoon and associated uses. |
| Lagoon Definition | Lagoon is defined, within this PD, as a man-made, reasonably large Body of Water (approx. 2 surface acres), allowing for Swimming and Water sports, and including Programmed Amenities with a Beach Atmosphere. |
| Layout (MU/MF) | Required Site Plan will identify building materials and sizes, public & private parking requirements, and orientation of buildings |
| Height Restriction (MU/MF) | Three (3) stories and not to exceed Fifty (50') Feet. Parapets and accent features shall be allowed increasing maximum height to Fifty-Eight (58') Feet. |

| | |
|---|---|
| Area/Minimum Lot Regulations (MF) | The lot area for the Multi-Family 15 shall be One Thousand Two Hundred (1,200') Square Feet per Dwelling Unit with a density of Thirty (30) Dwelling Units per gross acre. The minimum project size shall be Eight (8) Acres. The maximum number of Multi-Family Units in Area D shall be Three Hundred (300). Minimum front, exterior side and rear yards will be fifteen (15') feet including adjacent to existing school. |
| Area/Minimum Lot Regulations (MU) | To allow flexibility due to unique layout and building requirements this will be approved with Final Site Plan. Minimum front, exterior side and rear yards will be fifteen (15') feet including adjacent to existing school. |
| Maximum Lot Coverage (MU/MF) | Sixty percent (60%) for main building slab. |
| Parking Requirements (MF-15) | Minimum 1.35 Spaces per Dwelling Unit. Compact parking is permitted up to Ten (10%) Percent of required spaces. No enclosed parking spaces shall be required. A maximum of Five (5) Bicycle Racks shall be required. |
| Parking Requirements (MU/Lagoon) | The necessary parking will be based upon the number and size of the actual Lagoon Venue uses, once final programming is completed, within this area. It is a combination of public, single-family residents, ride-share, and golf cart parking. This necessary parking will evolve over the build-out of the project, with the single-family residents not needing a large amount of parking over time. This will be part of the site plan approval. |
| Min Floor Area Per Dwelling Unit (MF) | One (1) Bedroom minimum unit size shall be Six Hundred (600') Square Feet. No minimum first floor building area is required. |
| Section 24.4.C. Items 2 and 4 (MF) | Not applicable to this P.D. |
| Section 24.4.E. Items 1 through 5 (MF) | Not applicable to this P.D. |
| Sections 24.5.A.B.C.D.E.F.G (MF) | Not applicable to this P.D. |
| Landscape (MU/MF) | Screening adjacent to lagoon and thoroughfare shall be a Six (6') Foot Ornamental Tubular Steel Fence. No landscape screen will be required to promote unobstructed views of lagoon. No interior landscaping, open space or separate playground areas shall be required due to Lagoon Amenity. |
| Usable Open Space Requirements (MU/MF) | See Below as defined for the entire planned development |
| Refuse Facilities (MU/MF) | No requirements apply if valet or trash pick-up is provided.  If valet or trash pick-up is not provided, the refuse facility shall be located no more than Three Hundred (300') Feet from a Dwelling Unit measured along the designated pedestrian travel path. |
| Building Length (MU/MF) | No restriction on Building Length |
| Sidewalk (MU/MF) | Five (5') feet in all cases |
| Building/Fire Lane (MU/MF) | All points of building to be within One Hundred Fifty (150') Feet of dedicated Fire Lane or FDC (Fire Department Connection) internal to the site |

**AREA E - Multi-Family 15 – Base Zoning MF-15 for any site plans containing multi-family units with the following amendments to the City's Zoning Ordinance**
**Refer to Exhibits "C" and "E"**

| | |
|---|---|
| Layout | Required Final Site Plan will identify building materials and sizes, public & private parking requirements, and orientation of buildings |
| Height Restriction | Three (3) stories and not to exceed Fifty (50') Feet. Parapets and accent features shall be allowed increasing maximum height to Fifty-Eight (58') Feet. |
| Area/Minimum Lot Regulations | The lot area for the Multi-Family 15 shall be One Thousand Two Hundred (1,200') Square Feet per Dwelling Unit with a density of Thirty (30) Dwelling Units per gross acre. The minimum project size shall be Eight (8) Acres. The maximum number of Multi-Family Units in Area D shall be Three Hundred (300). |
| Maximum Lot Coverage | Sixty (60%) Percent for main building slabs |
| Parking Requirements | Minimum 1.35 Spaces per Dwelling Unit. Compact parking is permitted up to Ten (10%) Percent of required spaces. No enclosed parking spaces shall be required. If utilized, carports may be metal framing with a shingle or metal roof. A maximum of Five (5) Bicycle Racks shall be required. |
| Min Floor Area Per Dwelling Unit | One (1) Bedroom minimum unit size shall be Six Hundred (600') Square Feet. No minimum first floor building area is required. |
| Section 24.4.C. Items 2 and 4 | Not applicable to this P.D. |
| Section 24.4.E. Items 1 through 5 | Not applicable to this P.D. |
| Sections 24.5.A.B.C.D.F.G | Not applicable to this P.D. |
| Landscape | Screening adjacent to thoroughfare and collector shall be a Six (6') Foot Ornamental Tubular Steel Fence. A minimum of Thirty (30%) Percent of the fence shall include a living screen.  Three (3") Inch caliper canopy Trees along this screening shall be planted at Fifty (50') Feet on center. No playground equipment will be required in the Area E. |
| Usable Open Space Requirements | See Below as defined for the overall entire planned development |
| Refuse Facilities | No requirements apply if valet or trash pick-up is provided.  If valet or trash pick-up is not provided, the refuse facility shall be located no more than Three Hundred (300') Feet from a Dwelling Unit measured along the designated pedestrian travel path. |
| Building Length | No restriction on Building Length |
| Sidewalk | Sidewalks will be five (5') feet wide |
| Building/Fire Lane | All points of building to be within One Hundred Fifty (150') Feet of dedicated Fire Lane or FDC (Fire Department Connection) internal to the site |
| Minimum front yard | Fifteen (15') Feet |

SPECIAL REQUIREMENTS (A, B, C, D and E) **Refer to Exhibits "C, C-1, F, F-1 and F-2"**

| | |
|---|---|
| Usable Open Space Requirements | The open space areas as shown on Exhibits C and C-1 shall be shared with all uses in the planned development.  This open space shall fulfill the open space requirements for all uses within the planned development including Areas A, B, C, D and E. This open space shall be Twenty (20%) Percent of the overall gross platted area, excluding rights-of-way for the thoroughfare and the Minor and Major collector streets shall be approximately 67 Acres in total. |

The open space contained within the Phase 1 Final Plat, the lagoon and the first phase of Multi-Family, Area D, shall be constructed concurrently with Phase 1.

**FM 741 Screening/Landscape**

Screening along FM 741 shall be a Six (6') Feet height board on board fence with Masonry Columns at a maximum of Five Hundred (500') Feet on center. Due to the extent of existing easements within this right of way, the developer does not intend to provide trees within this area. Landscape plantings will be achieved in this area to include sweeping mass plantings of various native plants and native grasses as shown on Exhibit F-1. The landscape buffer is approximately 75 foot in width in this area.

Six (6') Feet ornamental tubular steel fence may be used when crossing open space areas, adjacent to open space, easements, along street frontage, or as desired to break up views along FM 741 Frontage. Landscape along FM 741 Frontage, due to existing utilities, shall be a combination of shrubs, native grasses, turf grass, and ground cover. The minimum Landscape Buffer will be fifteen (15') feet wide. These FM 741 Frontage fencing and landscaping will be maintained by the Homeowners Association.

**Interior Major Collector & Minor Collector Screening/Landscaping**

Interior landscape/screening along the onsite thoroughfare & collector streets shall consist of shrubs, native grasses, turf grass, and ground cover along with a Six (6') Feet tall board/board fence, also allowing for a six-foot ornamental tubular steel fencing to be used where appropriate. Masonry columns shall be placed at a maximum of Five Hundred (500') Feet on center and at intersecting streets. Three (3') Inch canopy caliper trees shall be installed along the thoroughfare and collector streets where adjacent to homes at Fifty (50') Feet on center. No canopy trees shall be required adjacent to Lagoon site. Landscape Buffer will be a minimum of fifteen (15') feet wide. These areas will be maintained by the Homeowners Association.

**Signage**

A comprehensive signage package shall be prepared for review and approval along with the site plan & preliminary plat. The following shall be permitted as part as this signed package:
1. Offsite premise signage is allowed throughout the PD.
2. Wall signs shall not exceed One Hundred Twenty (120 SF) Square Feet on the front façade and a maximum of Sixty (60 SF) Square Feet if both sides of the wall are used (Areas D & E only).
3. Building mounted blade signs shall not exceed One Hundred Twenty (120 SF) Square Feet. Under canopy, blade signs shall not exceed Ten (10 SF) Square Feet (Areas D & E only).
4. Monumentation/Identification elements, wall murals or sculptures & fountains shall not exceed Forty (40') Feet in height and are allowed throughout the PD.
5. CEVM signs are allowed and shall not exceed the size of wall signs.
6. Site signage including sign letters are allowed to sit on top of walls.

7.  Signs on buildings may be placed up to a height of Fifty-five (55') Feet.
8.  Wayfinding signs shall be allowed on thoroughfare and collector streets and along golf cart paths/trails for directing traffic and visitors to their destinations.

Preliminary Sign Locations & Sizes
Exhibit F
-FM741 North Side

| | |
|---|---|
| Median Sign | Allowed at each entry |
| | Max. 4' Height x 16' Length (64 SF), Lettering 2' Height x 11' Length or 22 SF.  Median signs will be double sided. |
| Monument Sign: | Max. 8' Height x 20' Length (160 SF), Lettering 3' Height x 16' Length or 48 SF.  Allowed 2 at each intersection. In lieu of the median signs the developer may elect to utilize monument signs, one each side of the road. |
| Entry Tower: | Allowed at Primary Entry, 2 maximum per Subdivision. Max. 22' Height, No sign allowed, only Logo.  The tower may be light with LED lights. |

-Collector:

| | |
|---|---|
| Median Sign | Allowed at each entry |
| | Max. 4' Height x 16' Length (64 SF), Lettering 2' Height x 11' Length or 22 SF.  Median signs will be double sided. |
| | Max. 8' Height x 20' Length (160 SF), Lettering 3' Height x 16' Length or 48 SF. Median Signs will be double sided. |

Exhibit F-1
-FM741 South Side

| | |
|---|---|
| Median Sign | Allowed at each entry |
| | Max. 4' Height x 16' Length (64 SF), Lettering 2' Height x 11' Length or 22 SF.  Median signs will be double sided. |
| | Max. 8' Height x 20' Length (160 SF), Lettering 3' Height x 16' Length or 48 SF. |
| Monument Sign: | Allowed 2 at each intersection. In lieu of the median signs the developer may elect to utilize monument signs, one each side of the road. |
| Entry Tower: | Allowed at Primary Entry, 2 maximum per Subdivision. Max. 22' Height, No sign allowed, only Logo.  The tower may be light with LED lights. |

**ADDITIONAL PERMITTED USES – AREAS A – E**
1.  Sales and Leasing Offices shall be allowed during the development and marketing of the residential areas.  Sales and Leasing Offices shall be removed when 100% of the single-family homes/lots have been sold. Sales and Leasing Offices will be permanent in Area D.
2.  Temporary buildings (such as construction trailers) and incidental construction work shall be allowed during construction.  Temporary buildings and incidental construction work shall be removed upon completion of each portion of the development.

**HOUSING STANDARDS**

    a.  Single-family residential fencing, other than screening fences/walls, shall be built in accordance with the City's fence regulations, as amended. Fences shall be a minimum of Six (6') Feet in height and a maximum of Eight (8') Feet in height.  Any private fence facing a public street shall have the board (i.e., finished) side of the fence located on the street side of the fence support structure.

    b.  Roof Pitch - The roof pitch of the homes shall be 6:12 minimum, except over stoops or porches, where a 4:12 minimum is allowed

    c.  Garage Doors: - Garage doors may face streets, but garage doors shall be set back a minimum of Twenty-five (25') Feet from any street right-of-way line.

    d.  Height Requirements - No single-family residential home shall exceed Thirty-six (36') Feet or 2½ stories in height.

    e.  Mailboxes – Cluster units of mailboxes shall be provided for the development if required or preferred by the United States Postal Service.

**DEVELOPMENT STANDARDS**

1. The development shall have a maximum density of 3.7 single family residential dwelling units per gross single family residential acre, or approximately 1,150 single-family residential lots based on approximately 310 single-family residential gross acres.

2. Overall Street and lot layout may be modified at the time of preliminary and final engineering (either per City requirements or by the applicant). Modifications may include, but shall not be limited to, reconfiguration of cul-de-sac streets, reducing the number of lots fronting onto collector streets, mitigating lengthy streets and cul-de-sacs, modifying odd-shaped lots such that they will meet lot width and depth minimums,  assignment of street names, mitigation of visibility impairments, etc.

3. The location and preliminary design of screening, landscape and open space shall be submitted for approval with the site plan and preliminary plat.  Construction plans for the screening fence/wall, landscape and open space are to be included as a part of the public works final civil engineering plans prior to final plat approval.

4. Street names shall be determined at platting.

5. All sidewalks and barrier free ramps within the community shall be Five (5') Feet wide and built in accordance with City standards.  Barrier free ramps shall be located at all street intersections and shall be constructed by the Developer concurrently with street construction.  The Developer shall construct all sidewalks that front a common area or lot owned by the HOA.  Sidewalks fronting or siding a residential lot in Areas A and B and C shall be constructed by the home builder concurrent with home construction.  All sidewalks in Area D and E shall be constructed concurrent with the development of those areas.

6. The developer shall also provide decorative street lighting that is acceptable to the City and to the electric utility provider.

7. Builder shall be allowed to move in a sales trailer prior to City acceptance of the subdivision for maintenance, subject to the discretion of the City's Building Official and subject to his approval of the trailer's location. Such trailer shall not be placed within any easement, street, or right-of-way.

8. The developer and Contractor shall be allowed to move in a project trailer prior to and during the construction, subject to City approval of location. Such trailer shall not be placed within any easement, street, or right-of-way. Project trailer is defined as a temporary structure to be used by the developer or contractor to coordinate construction activities.

## HOMEOWNERS ASSOCIATION

A Homeowners Association (HOA) shall be established to maintain common area improvements specifically identified within this ordinance and shown on the Concept Plan, Preliminary and Final Engineering Plans. ALL screening, open space and landscape buffers shall be owned and maintained by the HOA. The HOA shall be established prior to the issuance of any house construction or building permit for the initial phase of development, and the HOA documents (e.g., articles of incorporation, bylaws, CCR's, etc.) shall be reviewed and approved by the City of Forney in accordance with Section 4.3 of the City's Subdivision Ordinance, as amended.





EXHIBIT "C-1"

# EXHIBIT "D"



**LEGEND:**

**Inside the Public Lagoon Attraction**

① Ticketing / lockers / restrooms
② Lounge pool
③ Restaurant
④ Restaurant outdoor dining
⑤ Semi-public event lawn
⑥ Multi-use pavillion
⑦ Primary beach
⑧ Swim up Bar
⑨ Boat Rental
⑩ Wet deck loungers
⑪ Cabanas
⑫ Turf seating areas
⑬ 3' Wading shelf
⑭ Zero Entry
⑮ Residential beach
⑯ Residential restrooms and pavillion
⑰ Hammock area
⑱ Waterfall
⑲ Aparment courtyard
⑳ Wood deck overlook
㉑ Slides and small zip line
㉒ Rock climbing
㉓ Dry play ground
㉔ Splash zone
㉕ Dig pit
㉖ Shade pavillion
㉗ "Lazy River"
㉘ Water shooters
㉙ Mechanical and service

**Note:**
This is a conceptual plan of the Lagoon Area
along with the proposed programming.  This may
be revised once the final engineering and lagoon
programming are complete.



LAGOON PROGRAM LEVEL SITE PLAN: FORNEY
MEGATEL HOMES FORNEY LAGOON DEVELOPMENT    Page 2

September 18, 2020



EXHIBIT "E"

MEGATEL FORNEY MULTI FAMILY CONCEP SAMPLE ELEVATIONS

Forney, Texas

20214 / 10.29.2020
Megatel



COPYRIGHT © HEDK ARCHITECTS ALL RIGHTS RESERVED



ZONING CONCEPTS
LANDSCAPE AND SCREENING
**BELLAGIO**

A HAYER SURVEY
ABSTRACT NO. 203
CITY OF FORNEY, KAUFMAN COUNTY, TEXAS

ENGINEER / APPLICANT:
USA PROFESSIONAL SERVICES GROUP, INC.
1525 VICEROY DRIVE
DALLAS, TEXAS 75235
PH. (214) 882-3198
CONTACT: DAVE SCHNURBUSCH, PE

LANDSCAPE ARCHITECT:
STUDIO 13 DESIGN GROUP, PLLC.
386 W. MAIN STREET
LEWISVILLE, TEXAS 75057
TBAE FIRM #. BR643
PH. (469) 635-1900
CONTACT: LEONARD REEVES, RLA, LI

EX. F



FM 741 CONCEPTUAL PLANTING
SCALE: 1"=60'-0"

ZONING CONCEPTS
LANDSCAPE AND SCREENING
BELLAGIO

A HAYER SURVEY
ABSTRACT NO. 203
CITY OF FORNEY, KAUFMAN COUNTY, TEXAS

ENGINEER / APPLICANT:
USA PROFESSIONAL SERVICES GROUP, INC.
1525 VICEROY DRIVE
DALLAS, TEXAS 75235
PH. (214) 882-3198
CONTACT: DAVE SCHURRBUSCH, PE

LANDSCAPE ARCHITECT:
STUDIO 13 DESIGN GROUP, PLLC.
386 W. MAIN STREET
LEWISVILLE, TEXAS 75057
TBAE FIRM #: BR643
PH. (469) 635-1900
CONTACT: LEONARD REEVES, RLA, LI

EX. F-1



**1** **6' HEIGHT WOOD FENCE SECTION**
F2
SCALE: 3/4"=1'-0"

**2** **PARTIAL 6' HEIGHT WOOD FENCE ELEVATION**
F2
SCALE: 3/4"=1'-0"

**3** **PARTIAL 6' ORN. METAL FENCE**
F2
SCALE: 3/4"=1'-0"

**7** **WAYFINDING**
F2
NTS

**4** **MONUMENT SIGN ELEVATION**
F2
SCALE: 1/2" = 1'-0"

**5** **MEDIAN SIGN ELEVATION**
F2
SCALE: 1/2" = 1'-0"

**6** **PRIMARY ENTRY (CONCEPT) ELEVATION**
F2
SCALE: 1/2"=1'-0"

**8** **MASONRY WALL ELEVATION**
F2
SCALE: 1/2" = 1'-0"

*ZONING CONCEPTS*
*LANDSCAPE AND SCREENING*
**BELLAGIO**

A HAYER SURVEY
ABSTRACT NO. 203
CITY OF FORNEY, KAUFMAN COUNTY, TEXAS

ENGINEER / APPLICANT:
USA PROFESSIONAL SERVICES GROUP, INC.
1525 VICEROY DRIVE
DALLAS, TEXAS 75235
PH. (214) 882-3198
CONTACT: DAVE SCHURBUSCH, PE

LANDSCAPE ARCHITECT:
STUDIO 13 DESIGN GROUP, PLLC.
386 W. MAIN STREET
LEWISVILLE, TEXAS 75057
TRAE FIRM #: BR643
PH. (469) 635-1900
CONTACT: LEONARD REEVES, RLA, LI

EX. F-2

I oppose the rezoning of the property on the East side of Forney High School for housing development/nightly rentals and a lagoon. The reason for opposing :  1) Traffic on 741 and traffic around High School.(even if and when when 741 is widened)   2). Nightly rentals in the area is unnecessary-Forney has 2 hotels.   3) Rowlett is building a lagoon on lake Ray Hubbard and the competition will be very competitive.  4) the noise this rezoning will bring to an otherwise quite area is a disruption to housing developments already in this area.  Please consider the rezoning and vote no.
 Kindly forward this to the Forney city council.  Please read into record for December 3 ,2020 meeting.
Sent from my iPhone

Gail Dean

---

1. I believe as of right now turning this property into commercial before TXDot begins working on this particular area will cause more traffic, which this area is already bad enough. Kids walk home through this area.

2. If the land is turned into commercial what kind of restrictions will be put on it? This is in a very family friendly place and the businesses built should be similar to the schools, churches and daycares.

3. I believe that something like community centers, library more geared toward family would be a better fit.

I have spoken with several members of the community and they do agree.

Lauren Befeld

---

To whom it may concern,

As a citizen of Forney & local business owner, I would like to show my support of the construction for the "Lagoon". Quite simply, I think itll generate much needed revenue for our growing city, as well as promote tourism. Pushing it away is a backwards step to limiting the natural growth of Forney.

Sincerely,

Samuel Haun

---

To whom it may concern,

I'm a resident near where the planned lagoon and housing are planned to be done. I do really like the idea of it and looking forward to family fun! With the widening already set for 741 then it won't be a problem of congestion this way. Please take this into consideration when voting on the development coming.

Thank you,

Jennifer Conway

To whom it may concern

I live in Chestnut Meadows and am horrified at the proposal of short term housing next to the high school. Not only do I think it's not needed, Forney has more homes being built than we can cope with. The infrastructure is just not here. Already the lines of traffic at the intersection of 548 and 1641 are ridiculous and if a train comes through, it's a 30 minute wait!

We have very little choice of restaurants and I feel the City of Forney needs to address that problem before any additional housing. Forney is becoming less desirable to live in rather than the other way around.

Greg Byrne

It is with concern I write this letter.  I have been informed by neighbors and the local newspaper that the City of Forney is considering more apartment units, commercial development, bars, etc.  My question to the city counsel is where are the roads that are supposed to support all these new developments?  Why are all these housing and commercial permits being allowed with no mention of the roads?  I have heard from numerous residents they are planning to leave Forney if this keeps getting worse.  I understand how small towns have growing pains but allowing more and more developments without requiring those same developers to do something about the road is problematic.   Many residents also feel like allowing more apartments into the city will just tear down the reason people moved here in the first place.  Have studies been done about the impact these new places will have on all?  Congestion is at an all time high now especially when the train decides to hold everyone up.    So, can you spell out how the City can recommend all these permits or what the plans are for increasing roads to accommodate these new residents and businesses?

Yes, I am a resident of Forney and this all concerns me very much.  I have never before in my life written a letter to a city concerning expansion.  I do not see how it will benefit Forney at all unless more definitive plans are put in place.

Thank you for your time.

Denise Miller

Hi Peter,

It's my understanding that P & Z will consider the proposed Bellagio development zoning at their meeting on Thursday. After reviewing the site plan and proposed zoning, I would like to express my opposition as a Forney resident to this project. Please feel free to share this opposition with the commissioners. My concerns are numbered below:

1.) Forney's minimum lot size is 7,700 square feet with a minimum width of 60'. The proposed zoning for Bellagio accommodates 5,000 square foot lots with 40' width. While developers can meet demand with the size of these lots and maximize profitability, the outlying areas of Forney already have quite a bit of product with 40' lots. It's also my understanding the minimum lot size at Overland Grove is about 6,000

square feet/50' lots. The proposed for Bellagio are even smaller. With the little land we have left in the city limits, we need to ensure developers comply to our standards.

2.) Depending on construction timeline, this will create quite a bit of additional traffic before and during TXDOT's widening of FM 741. If the multi family is constructed first along with the 5,000 sf lots, it could create traffic woes amidst road construction.

3.) It's my understanding a housing development was turned down by P & Z several months ago at a site First Texas Homes was looking to develop off 1641 because they planned homes around the 1,800 square foot range. This development proposes a similar type with an even smaller footprint (1,600 sf). Therefore, it appears P & Z set somewhat of a precedent on single family development (not patio/zero lot line development) of opposing this type of home footprint (along with small lot sizes) when they denied that development.

4.) Having worked with development for several years, I've noticed most proposed lagoons do not pan out. The one in Rowlett has yet to be completed and Prosper is the only North Texas city to my knowledge with a lagoon (accompanied with home prices around $500k). Therefore, a lagoon in Forney seems quite risky from a land economics use standpoint.

Thank you for your work and service to the citizens of Forney.

Sincerely,
Stewart McGregor

---

To my surprise, i just learned that you have plans to build Hotel/Motel and Bars right next to the High School where our children go to get an education! Not HAPPY!  YOU CLOSED THE ONLY LIBRARY TO PUT A BAR! I am in disbelieve that this project is even considered!

Please read this at the meeting on Thursday.. Than you

Sylvia Gomez

---

I would like to voice my concerns on why I think this is a bad idea.
1. Unsafe for the kids nearby if open during school hours.
2. If the kids want to skip, they have easy access to going right next door.
3. Overnight rentals could lead to people staying the night as a cover up for other things such as drug selling, prostitution, etc.
Example of something similar.
https://community.withairbnb.com/t5/Hosting/Guests-booking-to-use-home-for-sex-workers/td-p/1000437
Thank you for your time.

(Angelica Casas)

---

Good afternoon, My name is Michelle Stone I have lived in Forney for 15 years. I like the idea of a natural lagoon. I do have concerns about traffic, taxes and water prices. I lived in Fox Hollow going on 4

years and the water her is very high. I lived on the North side on Alpine St for 12 years and the water was much cheaper there. I believe the lagoon could be a nice addition to our community as long as it doest cause more issues with traffic, taxes and water prices. Thank you for your time.

Sincerely,

Michelle Stone

To Whom it may concern,

My wife and I live at 219 S Chestnut St, Forney, TX 75126 inside city limits and are registered voters.

We are for the new lagoon development being approved and the zoning changed.

My only concern after watching the debacle Rowlett went through recently is to have in the contract the amenities promised built very early on prior to building permits being issued for other work. This would keep the developer from building a bunch of homes and multi family dwellings before leaving without the promised amenities as the developer in Rowlett did.

Sincerely,

Nate Dettmer

Dear City Council,

I am not in favor of erecting multi-family housing and/or retail space near Forney High School.  In fact, I am vehemently opposed to it.  This seems like a terrible idea for our community.  Instead we need further support and development of our infrastructure before agreeing to build where our communities are already very congested.

In addition - while studies show that low income and/or "affordable" housing does not necessarily guarantee an increase in crime, they do find that people tend to flee the area anyway out of either racial or class prejudice.  We need to preserve our rural single family home communities - so that crime and congestion don't further push out families seeking what they deem as a peaceful community and a solid education for their children.

Forney is growing quickly - because families are seeking solace from crime-ridden areas closer to the city.  The underlying belief of those of us who live south of Highway 80 is that retail and apartments attract activities we do not want in our neighborhoods.  The proof of that is in our police briefing information.  Theft, burglary, and unsafe environments for children are reported more and more near the retail and apartment developments north of Highway 80.  I can speak for myself and many of my concerned neighbors.  We do NOT want to attract this kind of activity closer to our neighborhood and we certainly don't want to purposely locate it closer to our high school aged kids.

Thank you, Sally Gathings

Hope all is well. My husband and I are NOT in favor of having apartments built off 741 near Forney High School. We live in the Lakewood Trails Subdivision off FM 741. Please contact me at (PHONE NUMBER REDACTED) if you have any questions.

Thank you,
Aaron and Tiffany Brown

Good day,

   I'm writing this email to show my support for the Forney Lagoon project.  From what I've gathered so far, if implemented successfully, this should bring a nice family-friendly environment to the area.  My only suggestion would be to add more amenities and less apartments.  Otherwise, this appears to be a great concept.  I'm keen in learning more about it as time goes on.

Regards,
Eric Amburgey

I wanted to write in support of the Bellagio neighborhood coming to Forney with Crystal Lagoon within the community.  I am a teacher in Forney ISD and a parent of two kids, ages 11 and 13.  I think this would be an amazing addition to Forney.  We are growing so quickly and this will be a great place for families to get together and get kids out of the house and off their screens!!!

Sincerely,

Lisa Rogers

Hello!  I am unable to attend the meeting tonight but I am a resident in Fox Hollow and I would like to go on record as opposing the rezoning to allow the Bellagio Development to come to this location in Forney.

There are multiple reasons for opposing this development and in no certain order -

1)       Forney roads are not yet ready to handle the increase in traffic that this will cause. There are many other subdivisions being worked on that will impede the already heavy Forney traffic.

2)       Many of us that reside in Fox Hollow picked this location due to the area – which was a lack of apartments.

3)       We are not in need of nightly rentals, we currently have at least 2 hotels and one was just completed last year – Holiday Inn.

4)       The noise for the surrounding residents when this project would be completed.

5)       Forney could benefit from other developments, such as a Library or a Rec Center.

Please forward to City Council.

City Council, please consider voting NO, for the rezoning of this area.

Please let me know if anything further is needed.

Thanks!

(Tiffany Fuqua)

Hello there!

I wanted to send a short email to explain how I feel about this project. I'm very interested in the whole project, and I feel as if it would be a good fit in Forney. However, we need to speak to TXDot about working a bit faster to upgrade these roads because our city is growing faster than they can build these roads. I do know that it's in the works but it's just fast enough with the amount of people who move here every day.

Brandy Stalcup

To whom it may concern,

My family of 4 recently moved to the Lakewood Trails development about 2 months ago. It has been a dream living here in Forney, and in particular, just Southeast of the High School and North of the 20.

We love the farm right next to us. And my two-year old reminds me everyday what sounds a cow makes because of the farm. That farm has also created special learning moments between my daughter and myself because the cows get so close to the property line. We love it.

To lose all of that would be devastating. What a gem it has been to have the farm as our neighbor. It would be a travesty to lose it.

Not only would it effect us as a FAMILY, but it would negatively affect the rest of the community as well.

Forney has built its name upon the principle of "FAMILY". To me, this means that ALL are together, working as a whole, for the greater good. It means no one is left behind or forgotten. It means love, respect, and dignity.

I would find it hard pressed for elected officials to feel like they are fulfilling this promise if the property is rezoned for multi use, multi family, and commercial:

First, 741 suffers from congestion and traffic as it is. Ushering in more homes and commercial real estate would only exacerbate a problem that has yet to be fixed. And, I believe that even widening the lanes or creating more traffic signals would not cure this problem once the property is rezoned.

Second, additional commercial property -- including hotels/overnight say -- would only serve to harm the aesthetic of this being A NEIGHBORHOOD. More importantly, this is a neighborhood next to a high school, where students walk to and from the location to their HOMES. Adding such a commercial extension would only make things unsafe for the youth in our community.

Third, our neighbors to the north are Rowlett and Rockwall. Over there already exists a lagoon and Lake Ray Hubbard. Therefore, building "competition" in a residential neighborhood, here, would do nothing but put us in a financial hole. To be frank, we could not compete with them -- and Rowlett is still struggling with their lagoon.

Fourth, the noise. Nothing robs a neighborhood of all its decency more than noise. We love the quiet. We love seeing the stars. We love the wildlife that lives within the tree line next door. We love the simplicity and rest that it brings. Building a parking lot for a profit would ruin all of that.

Fifth, know your surroundings. Around this little area of consideration are daycares, churches, and homes. Again, it is a community of FAMILIES that live together, work together, serve together, and worship together. If commercial property or multi use/ multi family were implemented, then this little gem of Forney FAMILIES would be destroyed. And in its place would be the proposition of only a potential profit--something of which Forney does not subscribe to.

I believe such a development has its purposes -- just not here. I am all for building things -- like a YMCA -- to serve the community needs. But I can tell you this -- THIS COMMUNITY DOES NOT NEED THIS.

For all of these reasons, I would ask that you VOTE NO on the rezoning project East of Forney High school. Please read this into the record. And please save the Forney Families that live here.

Thank you for your consideration,

James M. Grossman

---

Hello,

I am a concerned Forney resident and I am writing to let the city know that I am opposed to the lagoon project, especially in the proposed location.   I moved into Fox Hollow in 2015 with my

main reason being schools that my young children would attend. It absolutely infuriated me that they changed my neighborhood school from elementary to intermediate. This was ALL due to over crowding.  Then miraculously the year after the change, the bond was proposed and all these things were happening to build new schools.  I am still not happy and my youngest started out at Rhea, had to be switched to another school further away then will be switched back to Rhea next year.

Again- all of this was due to over crowding.

Forney can not stop all of the development outside the city limits - that is overcrowding our schools. But they can control what is being proposed within the city limits! Our infrastructure can not handle more apartments and smaller lot size homes.  This is more people going to our schools and triple the vehicles that would be on the road. The proposed road expansions are not schedule to even start until AFTER the additional homes would be finished.  This is a problem!  I own and business and live in Forney and the traffic has become almost unbearable over the last 5 years. As an insurance agent, I would love the growth but at the rate everything is happening I am strongly against this.

Not only can the roads not handle this, I believe with many other citizens this will bring down the values of the near by communities.

The smaller houses are being purchased as investment homes from people not in our area and MANY from out of state such as California.  An abundance of rental homes that can easily become section 8 housing.  I am not saying that all section 8 renters bring violent crime; however, the majority of this does.

Placing an attraction such as a lagoon, which includes bars and restaurants next to a high school and daycare is not the best decision.

Instead of lagoons the City needs to work on things such as building a few more fire departments to help with the influx of housing.

Amy Hollaman

As a resident of forney and the villages of fox hollow I vote no! No! On any apartments near it neighborhood please. Please take into consideration the negative effects it will have on our neighborhood and city. Just look at what the townhomes are doing to heartland.

Thanks

(Amanda Flanigan)

# Exhibit C

**Minutes**
**Forney City Council and**
**Planning and Zoning Commission**
**Tuesday, September 22, 2020**
**6:30 p.m. Special Joint Workshop**
**City Hall, 101 E. Main Street, Forney, Texas 75126**

**I.    CALL TO ORDER**

Mayor Pro Tem Myers called the meeting to order at 6:31 p.m.  Council present were Mayor Pro Tem Shaun Myers and Council Members James Traylor, Robbie Powers, Derald Cooper and David Johnson.  Mayor Mary Penn and Council Member Kevin Moon were absent.  Also present were Tony Carson, Jon Thatcher, Dorothy Brooks and Karl Zook, Peter Morgan, Gladis Saldana and Alex Dixson.

P&Z Commissioner Anthony Shimkus called the meeting to order at 6:33 p.m.   P&Z Commissioners present were Misty Holler, Cecil Chambers, Jamie Brown, Bennie Jones and Anthony Shimkus.  Commissioners Greg Helm and Casey Bingham were absent.

Darrell Grooms facilitated the meeting.

**II.    WORKSHOP DISCUSSION ITEMS**

    **1.    Discussion regarding the proposed and potential future residential development within the City of Forney including land use planning, zoning regulations, utilities and infrastructure development, thoroughfare planning, and all related issues.**

Discussion ensued regarding the Bellagio project, which includes a "crystal lagoon."  This project will require a PID and a Development Agreement.  There are less than 10 lagoons like this in the USA today.  Inside the Public Lagoon Attraction will include lockers and restrooms, a lounge pool a restaurant, a multi-use pavilion/stage for concerts and performances, a swim up bar, boat rental, a residential beach, a waterfall, a splash zone, and a lazy river to name a few of the attractions. The depth of the water will be 7 – 9 feet.  It will be fresh/metered water and the developer will ask for an Industrial Agreement.  The lagoon will be open to everyone and will be open year-round. Reservations will be required.  Hours will be 8 a.m. to 6 p.m.  Tickets will cost approximately $30 per person.  No pets will be allowed in the lagoon area.  The lagoon will be built in Phase 1 and paid for by the developer.  It will take about 2 years to build.  The whole project will be a "master planned community."  The zoning and building materials for the project will be for "beach style" homes.  Wider sidewalks will need to be constructed to accommodate golf cars.  The HOA dues will be approximately $100 per month.  Landscape shielding will be in place between the project and the High School.

The Oak Creek project will have approximately 117 patio homes.  The lots will be smaller than we normally see, but will nicely accommodate the patio homes.  There will be a dog park plus a small HOA-owned park.  The developer is willing to do a Development Agreement.  Council Member Johnson stated that this is something that we need.  Trees will shield the development and it is about the only product that can go on that property.

51
52  Commissioner Shimkus left the meeting at this time.
53
54  There being no further discussion, Mayor Pro Tem Myers called for a motion to adjourn at 8:04
55  p.m.  Council Member Powers made a motion to adjourn and Council Member Johnson seconded
56  the motion.  The motion passed by a vote of 5 ayes and 2 absent [Penn and Moon].
57
58  P&Z Commissioner Holler made a motion to adjourn at 8:04 p.m. and Commissioner Chambers
59  seconded the motion.  The motion passed by a vote of 4 ayes and 3 absent [Shimkus, Helm and
60  Bingham].
61
62        **PASSED AND APPROVED BY THE CITY COUNCIL OF THE CITY OF FORNEY,**
63  **TEXAS, this _6_ day of _October_ , 2020.**
64
65
66
67  **ATTEST:**                                          **Mary Penn, Mayor**
68
69
70
71  **Dorothy Brooks, City Secretary**
72

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Casey McGovern on behalf of Richard Anigian
Bar No. 1264700
Casey.McGovern@haynesboone.com
Envelope ID: 61144943
Status as of 1/26/2022 8:31 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Richard DAnigian | | rick.anigian@haynesboone.com | 1/25/2022 5:01:38 PM | SENT |
| Jason Jordan | | jason.jordan@haynesboone.com | 1/25/2022 5:01:38 PM | SENT |
| Chris Knight | | chris.knight@haynesboone.com | 1/25/2022 5:01:38 PM | SENT |
| Dawn Weed | | Dawn.Weed@btlaw.com | 1/25/2022 5:01:38 PM | SENT |

Associated Case Party: MEGATEL HOMES, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Victor D.Vital | | Victor.Vital@btlaw.com | 1/25/2022 5:01:38 PM | SENT |
| V. Chisara Ezie-Boncoeur | | cezie@btlaw.com | 1/25/2022 5:01:38 PM | SENT |